[No. A083746. First Dist., Div. Four. Apr. 18, 2000.]

In re the Marriage of MARY E. and THOMAS D. TERRY.
MARY E. TERRY, Appellant, v.
THOMAS D. TERRY, Respondent.

[No. A083772. First Dist., Div. Four. Apr. 18, 2000.]

In re the Marriage of MARY E. and THOMAS D. TERRY.
MARY E. TERRY, Respondent, v.
THOMAS D. TERRY, Appellant.

## COUNSEL

Adams & Dornan, Verna A. Adams; Law Offices of Bernard N. Wolf and Bernard N. Wolf for Appellant in No. A083746 and for Respondent in No. A083772.

DeGoff & Sherman and Richard Sherman for Appellant in No. A083772 and for Respondent in No. A083746.

## OPINION

**REARDON, J.**—Three times the trial court has ruled on the matter of spousal support in this case. Each time the supported spouse's estate has grown and the supporting spouse's income has diminished. Yet, on this last go-around, with the supported spouse enjoying an investment portfolio of nearly $3.75 million, retirement benefits approaching $1 million and real estate valued at $773,500, the trial court refused to invoke its independent

authority under Family Code[1] section 4322 to terminate support. We reverse the order diminishing, but continuing spousal support, and concurrently affirm the subsequent order denying the supported spouse's request for attorney fees.

## I. FACTUAL BACKGROUND

Mary E. and Thomas D. Terry separated in April 1993 after a 34-year marriage. By then their three children were adults. Mr. Terry has remarried; Ms. Terry has not.

Mr. Terry has been one of the country's leading tax experts in the area of employee benefits. He has been a partner with two Bay Area law firms, first with Morrison & Foerster and then with Pillsbury, Madison & Sutro (PM&S). In between, Mr. Terry served as a benefits tax counsel in the United States Treasury Department. In contrast, Ms. Terry has no significant out-of-home employment.

In December 1993 the trial court entered judgment dissolving the marriage. The parties reserved issues of property division and support. When all was said and done, by stipulation or court order, major items of property were disposed of as follows: (1) Mr. Terry's retirement benefits from Morrison & Foerster and PM&S were divided equally; (2) the family home in Kentfield, valued at $773,500, was awarded to Ms. Terry; (3) the value of Mr. Terry's law practice with PM&S, set at $276,868, was awarded to him; and (4) Ms. Terry made an equalizing payment of $220,830.50 to Mr. Terry.

### A. *Initial Spousal Support Award*

Spousal support was hotly disputed at trial, in part because Ms. Terry had substantial separate property assets. Trial took place in late 1994.

In its May 1995 statement of decision and August 1995 order, the trial court found that with separate property assets of approximately $2 million, Ms. Terry's net worth was "substantially greater than Mr. Terry's." Nonetheless it ordered Mr. Terry to pay spousal support of $8,750 per month based on the following: Ms. Terry's reasonable needs were $10,000 to $12,000 per month, net of taxes;[2] Mr. Terry had the ability to pay support, with an annual income of $315,960 from PM&S and unearned income of

---

[1] All statutory references are to the Family Code.

[2] The court made it clear that this baseline amount was not equivalent to the marital standard of living. That standard had been complemented and subsidized by infusions from both parties' separate property and thus was an inappropriate measure with which to calculate Ms. Terry's needs for purposes of spousal support. The court concluded: "A reasonable

$25,884; and Ms. Terry's investment portfolio would generate an estimated 5 percent return,[3] or approximately $82,908. The $8,750 per month in spousal support, combined with income from Ms. Terry's investments, would meet her reasonable needs. Under these circumstances, the court saw no need for Ms. Terry to change her investment strategy or draw down on the retirement accounts.

B. *Motion to Reduce Spousal Support*

In February 1996 Mr. Terry moved to reduce spousal support by $2,000 a month because Ms. Terry had received an additional $303,000 from her mother's estate, and his income had decreased. While the motion was pending, PM&S notified Mr. Terry that he would be converted to a "salaried" partner, with his 1996 income reduced to $250,000 and his 1997 income to $225,000. Meanwhile, Ms. Terry's portfolio had increased to $2,702,597.65.

In a supplemental declaration, Mr. Terry asked to have his support obligation reduced to $5,200 per month. The trial court reduced spousal support to $5,500 per month.

C. *Motion to Terminate Spousal Support*

Upon learning that his employment with PM&S would permanently end effective January 1, 1998, Mr. Terry moved to terminate support. In the meantime he explored job possibilities in the private and public sectors, but to no avail. Mr. Terry explained in his moving papers that since he was 64 at the time and many private firms have a mandatory retirement age of 65, private employment was unrealistic, particularly since he did not have a personal "book of business."

Due to these developments, Mr. Terry decided to start drawing $5,500 per month from his retirement account. As well, he started a consulting practice, earning gross receipts of $12,843.75 during the first three months.

During this time frame, Ms. Terry's investments increased in value. Her February 1998 Merrill Lynch account statement revealed a net portfolio

approximation of the marital standard, based on the funds which would have been available from community sources, for Ms. Terry alone, would require $10,000 per month after taxes . . . . This number is consistent with the after-tax amount available to them during the marriage."

[3]The court relied on Ms. Terry's November 1994 Merrill Lynch account statement, which reflected a portfolio valued at $2,037,884. The account statement itself shows estimated annual income of $67,397 from priced investments plus a current yield of 4.32 percent on the "money accounts." With money accounts totaling $364,587, the annual yield would be $15,750, for a total estimated annual income of $83,147. Whichever figure is used—$82,908 or $83,147—the rate of return is approximately 4.1 percent, not 5 percent.

value of $3,545,788. Annual income was estimated at $95,130, for a current yield of approximately 2.7 percent. Ms. Terry also reported interest income in the amount of $9,472 on a $200,000 promissory note, as well as $787 from a government pension.

Mr. Terry pointed out that Ms. Terry's portfolio consisted primarily of low-basis stocks, which she managed in a manner so as not to maximize income. Should Ms. Terry elect to increase income by reconfiguring her portfolio, there would be capital gains taxes, but the tax consequence would be substantially reduced because "1997 tax legislation reduced capital gains tax rates from 28% to 20% . . . ." He further explained that Ms. Terry's retirement account had grown to $959,786. Ms. Terry turned 61 on January 20, 1998, at which time she could draw down on the retirement account without incurring any penalty.

Ms. Terry responded that (1) her portfolio had decreased slightly because of the $200,000 loan; (2) she should not be expected to withdraw from the retirement accounts until after Mr. Terry's death; (3) Mr. Terry could easily affiliate with a major firm, obtain a government position or teach, thereby increasing his income; and (4) the expenses associated with his consulting business were unnecessarily high.

The trial court found there had been substantial changes in circumstances, namely the loss of Mr. Terry's job and the increase in value of Ms. Terry's separate assets. However, the court concluded the showing was insufficient to require Ms. Terry to begin drawing down on her retirement benefits or to change her investment strategy. The court further found that Mr. Terry's business expenses "appear somewhat overstated" and imputed approximately $80,000 in annual income to him from the consulting practice. The court reduced spousal support to $2,750 per month. In so doing it took into consideration the funds that Mr. Terry was drawing from his retirement account. As well, the court observed that under the current order, Mr. Terry would "be unable to pay his living expenses" but that his spouse's income would be available to reduce his own living expenses.

Mr. Terry requested specific findings as to Ms. Terry's net worth and rate of return on her investments, but the court refused. Thereafter, the court ordered each party to pay his or her own attorney fees and cost of suit. Mr. Terry appeals from the modification order (case No. A083772); Ms. Terry cross-appeals from the fee order (case No. A083746).

## II. Discussion

### A. *Support Order*

#### 1. *Introduction; Standard of Review*

█ The trial court has broad discretion to decide whether to modify a spousal support order based on a material change of circumstances. In exercising this discretion, the court considers the same criteria set forth in section 4320 as it considered when making the initial order and any subsequent modification order. (*In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 76-78 [46 Cal.Rptr.2d 8].) These factors include the ability of the supporting party to pay; the needs of each party based on the standard of living established during the marriage; the obligations and assets of each party; and the balance of hardships to each party. (§ 4320, subds. (c)-(e), (j).)

As well, section 4322 provides that in original or modification proceedings, "where there are no children, and a party has or acquires a separate estate, including income from employment, sufficient for the party's proper support, *no* support shall be ordered or continued against the other party." (Italics added.) Denial of continued support is thus mandatory if the sufficiency threshold is met, irrespective of circumstances the court would otherwise consider under section 4320.

█ The trial court repeatedly found that Ms. Terry's separate estate was not sufficient to meet her proper needs for support, and thus section 4322 did not apply. This, despite the fact that Ms. Terry's separate estate has consistently grown.

The initial support order set Ms. Terry's reasonable needs as totaling between $10,000 and $12,000 per month after taxes. She did not appeal that ruling and it is too late to do so now. This is the pivotal amount for ascertaining Mr. Terry's support obligation, if any.

·The question under section 4322 is whether Ms. Terry's separate estate is sufficient to fund this level of support. This is a mixed question of fact and law calling for (1) the establishment of the historical facts concerning the value and character of Ms. Terry's separate estate as well as her support needs; and (2) the application of those facts to the legal standard of sufficiency with the resulting determination as to whether that standard is met. The facts are not in dispute.

█ When the inquiry into whether the standard is met "requires a critical consideration, in a factual context, of legal principles and their underlying

values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) The trial court's section 4322 determination that a separate estate is or is not sufficient for proper support is not a factual description or statement. Rather, it is a legal conclusion that an estate reasonably could, or could not, generate sufficient income to provide for a spouse's proper support, with legal ramifications for both parties. Thus, our standard of review is de novo.

*In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845 [194 Cal.Rptr. 176] (*McNaughton*) is not to the contrary. There, the husband claimed the wife's separate estate was sufficient for her expenses, relying on *Dallman v. Dallman* (1959) 170 Cal.App.2d 729 [339 P.2d 636] (*Dallman*). Said the court in *McNaughton*: "The [*Dallman*] court, in reviewing a spousal support order of $750 a month, stated, 'the mere fact that a party has a separate estate will not prevent the court's awarding him or her alimony. It is only when such a party has a separate estate sufficient for his or her *proper* support that the court is denied the power to make such an award.' (*Id.*, at p. 734.) Whether an estate is sufficient for one's proper support is a fact question for the trial court." (*McNaughton, supra,* 145 Cal.App.3d at p. 850, original italics.)

The emphasis in this excerpt is on the needs of the party—what is necessary for one's *proper* support—not on whether the estate is capable of generating that amount. In any event, unlike in the present case, the parties in *McNaughton disputed* the historical facts, in particular the amount of annual gross income actually generated by wife's separate property. As well, unlike in the present case, *McNaughton* involved a spousal support order entered just after the community assets had been divided. The parties' circumstances were in a state of flux and wife had not had an opportunity to put her own investment scheme in place. (*McNaughton, supra,* 145 Cal.App.3d at pp. 852-853.)

Here, the parties have accepted the Merrill Lynch account statements as accurately reflecting the actual income from Ms. Terry's investment and money accounts. Moreover, Ms. Terry has adhered to an established investment strategy and its results have been traced over time. The issue at this juncture is whether, in light of the appreciation of Ms. Terry's estate, section 4322 is implicated. That answer is subject to de novo review.

2. *Analysis*

 a. *The "Separate Estate" Concept*

 At the outset we clarify that the section 4322 concept of a "separate estate" is not limited to the income actually and presently produced by the

estate. Ms. Terry asserts to the contrary that the court should look only to actual income, quoting from *McNaughton, supra,* 145 Cal.App.3d at page 850: "Civil Code section 4806 [(now § 4322)] is applicable only when the supported spouse's *income* is sufficient to meet that spouse's needs, which was not the case here." (Italics added.)

It is important to place this quote in the context of the disputed issues raised, one being how much *income* the wife's separate property generated. The quote immediately followed the court's conclusion that the wife's separate property generated considerably *less income* than the husband claimed. In any event, we reject the notion that the court should look only to the income *currently* produced by the estate of the supported spouse in resolving whether section 4322 applies.

The statute references the estate, not just the income from the estate. Had the Legislature intended to cut off or preclude spousal support only when a spouse has or acquires income sufficient for that party's proper support, it could easily have said so. The concept of an estate, on the other hand, more broadly embraces "[t]he degree, quantity, nature, and extent of interest which a person has in real and personal property." (Black's Law Dict. (5th ed. 1979) p. 490.)[4]

Having concluded that the section 4322 notion of the separate estate is not synonymous with income, we are not suggesting that courts look beyond the actual income produced from the supported spouse's assets in cases where those assets are reasonably managed. Again, the ultimate section 4322 determination is whether a particular estate is, or is not, reasonably capable of providing for a spouse's proper support. That determination will vary with the nature of the particular estate. Where, as here, the supporting spouse challenges the reasonableness of the supported spouse's investment strategy, the court should look to the estate as a whole, including the actual and reasonable income potential from investment assets, as well as their total value, in resolving the issue of the estate's sufficiency for proper support.

Additionally, we note that section 4322 does not restrict the source of property comprising the estate. The only requirement is that there be a

---

[4]For example, in *Dallman, supra,* 170 Cal.App.2d 729, the wife was awarded a $500,000 estate which generated a net income of approximately $978 per month. (*Id.* at p. 737.) Mrs. Dallman asserted she needed $1,600 per month for her proper support. (*Id.* at p. 735.) Among other things, the reviewing court observed that *"disregarding any income [the estate] might produce"* (*ibid.,* italics added), her separate property would support her at the $1,600 per month rate "for more than 25 years" (*ibid.*). Ultimately, the court held it was error to find that the wife's separate estate was insufficient for her proper support where no competent proof was made to support the items of monthly expenses identified by the wife. (*Id.* at p. 737.)

separate estate. (§ 4322; *Dallman, supra,* 170 Cal.App.2d at p. 733.) Thus, assets acquired through the final division of community property should be considered in assessing the sufficiency of the estate for proper support. (See *Dallman, supra,* 170 Cal.App.2d at p. 734; *In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 413-414 [6 Cal.Rptr.2d 791] *(Biderman)*; *Mc-Naughton, supra,* 145 Cal.App.3d at pp. 850-853.)

 b. *Section 4322 Applies*

 At the initial trial the parties stipulated that the value of Ms. Terry's Merrill Lynch account, as reflected in her November 1994 statement, was $2,037,884. The trial court estimated that the rate of return on that account was 5 percent—in reality it was in the neighborhood of 4.1 percent. Moving forward to the hearing on the motion to terminate support, the value of Ms. Terry's Merrill Lynch portfolio had increased substantially, to $3,545,788 as reflected on the February 1998 account statement. Yet the estimated annual income from the Merrill Lynch account was $95,130, for a lower yield of approximately 2.7 percent. Taking into account the $200,000 promissory note and income thereon of $9,472, Ms. Terry had investments totaling $3,745,788, with income of approximately $104,602, for an overall yield of approximately 2.8 percent.

 As of the final hearing, Ms. Terry's retirement account had also grown substantially, from approximately $620,000 in 1995 to $943,423. At age 61, she could now draw on the account without penalty. She also owns a home worth at least $773,500, with nothing owing.

 *Biderman, supra,* 5 Cal.App.4th 409 is helpful to our analysis. *Biderman* involved an appeal from an order extending permanent spousal support beyond the termination date. The trial court originally ordered support for one year to permit the disabled husband to convert his assets so they would generate increased income to competently care for him. It then granted an extension on grounds he was still disabled after one year, but the Court of Appeal reversed. Recognizing the legislative mandate of the predecessor to section 4322, the reviewing court approved the original order, explaining: "It is not unreasonable for a trial court to conclude that even a clinically depressed spouse with a net estate of $350,000 should be self-supporting." *(Biderman, supra,* at p. 414.)

 ▪ Similarly, we hold that the trial court erred in concluding that Ms. Terry's estate was not sufficient to meet her proper support needs of between $120,000 and $144,000 per year, net of taxes. Despite the significant appreciation of Ms. Terry's asset base from the time of the first hearing to the

last—for example, her investment portfolio grew in value by $1,707,904 and her retirement fund grew by $323,423—the trial court persisted in its reticence to do anything that might prompt Ms. Terry to change her investment strategy, draw down on the retirement account or liquidate or leverage any of her substantial assets. This reticence persisted despite a parallel reduction in yield, the advent of a more advantageous capital gains tax rate, and the elimination of any penalty for accessing her retirement funds.

To put the matter in perspective: At most, a decision that Ms. Terry's estate met the sufficiency threshold without continued support would implicate a small amount of the *appreciation* of her asset base, nothing more. The trial court's reticence did not make sense in light of the totality of the facts.[5] For purposes of section 4322, what made sense as an investment strategy for growth in 1994 no longer made sense in 1998, in light of the substantial appreciation of Ms. Terry's estate and the other advantageous factors noted above. The legal standard of sufficiency having been met, the dictates of section 4322 compelled termination of spousal support. It is time for Ms. Terry to either generate more income or otherwise resort to a negligible portion of her growing capital to meet her needs.

Ms. Terry asserts that she should not be required to change her investment strategy "without at least being warned that the court expects her to do so." We disagree. Ms. Terry has been aware of the court's independent authority under section 4322 since entry of the first support order. Nothing more could be achieved by warnings because section 4322 applies, and its operation is mandatory, whenever a spouse has, *or acquires*, a separate estate adequate for proper support.

While we realize that a decision that an estate is adequate to meet the needs of a previously supported spouse without continued support can trigger reassessment of all matters financial, including investment strategies, that decision is the spouse's, not the trial court's. Under section 4322, it is not up to the trial court to direct Ms. Terry to do anything in particular. The trial court's job is to ascertain whether the estate reasonably could generate sufficient income for proper support, not to second-guess how the spouse will manage that estate to ensure sufficient income. Thus a decision that an estate is adequate or sufficient is not a decision that any particular investment strategy must change, although that may happen.

---

[5]We recognize that the trial court made its section 4322 ruling without the benefit of expert testimony on such issues as rates of return or the tax consequences attendant to any reconfiguration of Ms. Terry's estate. Expert testimony of course would not be inappropriate, but neither is it necessary in light of what is known about the size of the estate, the established level of support, the trajectory of appreciation, the reduction of the capital gains tax rate and the attainment of penalty-free access to retirement funds.

## B. *Attorney Fee Order*

Ms. Terry separately appeals from the order denying her request that Mr. Terry pay $5,000 for her fees and costs on his motion to terminate support. The trial court may in its discretion award fees or costs reasonably necessary to maintain or defend any proceeding occurring after entry of judgment. (§ 2030, subd. (c).) The trial court is to decide "what is just and reasonable under the relative circumstances" (§ 2032, subd. (b)), taking into consideration "the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately . . . . The fact that the party requesting an award of attorney's fees and costs has resources . . . is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances" (*ibid.*).

In assessing the applicant's relative "need" and the other party's ability to pay, the court may take into account "all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1167 [62 Cal.Rptr.2d 466].) In light of the fact that Ms. Terry is by far the wealthier spouse, the trial court did not abuse its discretion in denying her fees.

## III. DISPOSITION

We reverse the order reducing, but continuing, spousal support with directions that the trial court enter an order terminating support and reserving jurisdiction only (case No. A083772). We affirm the order requiring Ms. Terry to pay her own fees (case No. A083746). We deny both parties' request for fees on appeal.

Hanlon, P. J., concurred.

**SEPULVEDA, J.,** Concurring and Dissenting.—I respectfully dissent from that portion of the majority's opinion reversing the trial court and ordering termination of spousal support. I concur in the remainder of the majority opinion.

The parties separated in 1993 after more than 34 years of marriage. In August 1995, the trial court entered a permanent order of spousal support in favor of Ms. Terry in the amount of $8,750 per month after finding that Mr.

Terry had an annual income between $315,000 and $340,000, and that Ms. Terry had reasonable needs amounting to $120,000 to $144,000 per year, net of taxes. The trial court further found this amount of support would not allow Ms. Terry to replicate the marital standard of living without tapping into the principal of her separate property assets. At the time, Ms. Terry had a Merrill Lynch portfolio of cash and securities worth approximately $2.04 million, which was generating annual pretax income of approximately $80,000 ($8,500 of which was tax-free income)—a return of approximately 4 percent per year. In the course of the 1995 support proceedings, the trial court expressly found—based on expert testimony—that Ms. Terry was receiving a reasonable rate of return on her investments, and rejected Mr. Terry's claim that he should not have to pay any spousal support because Ms. Terry's "separate estate" was "sufficient for [her] proper support," within the meaning of Family Code section 4322.[1] Mr. Terry did not appeal from this support order.

Only six months later, in February 1996, Mr. Terry filed the first of two motions to reduce his spousal support obligations, claiming that his annual income had dropped to $301,000 and that it would further decrease to $250,000 in 1996. Moreover, without any change in her investment strategy, Ms. Terry's portfolio had by that time increased in value to approximately $2.7 million,[2] and was generating annual pretax income of $93,771—a return of approximately 3.5 percent per year.[3] The trial court again approved Ms. Terry's investment strategy but, based on the change in the parties' incomes, granted Mr. Terry's motion and reduced his spousal support obligation by 37 percent to $5,500 per month. The court again noted that this support order would not be sufficient to provide for Ms. Terry at the marital standard of living unless she invaded the principal of her capital assets, thus reducing the amount available to generate income (or at least the rate of growth in her income).

[1]All statutory references are to the Family Code.

[2]This amount included $303,000 in additional funds Ms. Terry received from her mother's estate in December 1995. It is noteworthy that, upon filing his first motion to reduce spousal support, Mr. Terry appeared to concede that Ms. Terry's investment strategy and the 4 percent rate of return she was receiving were reasonable, when he argued: "It is appropriate to assume that [Ms. Terry] will invest those funds in the fashion in which her remaining investment portfolio is invested. [Ms. Terry's] counsel suggested that Petitioner could receive a 4% return on the $303,000."

[3]Curiously, although Mr. Terry had received an equalizing payment of $220,000 from Ms. Terry upon the final division of the parties' community property in October 1995, and at the same time had confirmed to him $243,000 as his separate property, Mr. Terry claimed his investment portfolio was worth only $177,507 in February 1996. In the trial court proceedings, he did not explain the $285,493 *decrease* in the value of his liquid assets. It is undisputed that at all relevant times both during marriage and after separation, Mr. and Ms. Terry had the same investment adviser, Don Hill, and pursued essentially the same investment strategy.

In December 1997—less than two and a half years after the permanent support order was entered—Mr. Terry again sought to reduce or terminate his support obligation, claiming that he had lost his job and was planning to begin drawing down his retirement accounts. Again without any change in her investment strategy, Ms. Terry's portfolio had increased in value to approximately $3.55 million, and her annual pretax income from all sources had increased to approximately $108,000. Counting her Merrill Lynch portfolio and a note from the parties' son (a total of approximately $3.75 million), and the estimated income of $104,602 from those assets, Ms. Terry was receiving a return of approximately 2.8 percent on her investments.[4] After a hearing in April 1998, the trial court specifically found that Mr. Terry had not in fact retired and imputed income of approximately $160,000 to him, apparently based on his actual earnings and earning capacity. However, on May 1, 1998, based on the changes in the parties' incomes, the trial court granted Mr. Terry's motion in part and reduced the amount of support by 50 percent, to $2,750 per month (or $33,000 per year). The trial court once again approved Ms. Terry's investment strategy, found there was no evidence to warrant a change in her strategy at that time, and specifically rejected Mr. Terry's claim that Ms. Terry's separate estate was now sufficient for her proper support. For the first time in these proceedings, the trial court also warned Ms. Terry that she might be required to become entirely self-supporting in the near future.

Mr. Terry appeals from this May 1998 order of the trial court reducing, but refusing to terminate, spousal support. The majority agrees with his position, reverses the trial court, and terminates spousal support with a reservation of jurisdiction. I believe the majority applies an incorrect standard of review, overlooks the question of who had the burden of proof on the relevant issues, and second-guesses the trial court's carefully considered, well modulated rulings on the issue of spousal support, which were made in light of the parties' changing circumstances and based on findings of fact supported by substantial evidence. The majority holding on the standard of appellate review would not only expand the scope of litigation over spousal support orders, but would greatly enlarge the role of the appellate courts in this area, at the expense of the courts that are best suited to deal with the

[4] These amounts include the $3,545,788 in Ms. Terry's February 1998 Merrill Lynch account statement, plus a $200,000 note she held on an interest-bearing loan she had made to the parties' son, the funds for which she withdrew from her Merrill Lynch account. In her income and expense statement for the 1998 modification proceeding, Ms. Terry listed the income from that loan as $9,472, plus $787 from a small government pension. The majority focuses on different figures for the value of Ms. Terry's assets and her investment income, and understates the rate of return at 2.7 percent. (Maj. opn., *ante*, at pp. 926-927.) Even Mr. Terry, in his briefs, acknowledges a better performance by Ms. Terry's investment portfolio, calculating the rate of return at 2.84 percent.

often fiercely contested issue of spousal support. In addition, the majority fails to provide meaningful guidance as to how the trial court should determine whether a former spouse's "separate estate" is or has become "sufficient for [his or her] proper support" within the meaning of section 4322. For these and other reasons, I respectfully dissent from the portions of the majority opinion that reverse the order of the trial court and direct entry of an order terminating spousal support.[5]

## A. The Standards of Review and Burden of Proof

In its statement of decision following the 1998 hearing on Mr. Terry's most recent modification motion, the trial court found "a substantial change of circumstances" in that Mr. Terry's income had decreased and Ms. Terry's investments had increased in value, thus generating more income than they were at the last prior hearing. Although the capital gains tax rate had decreased from 28 to 20 percent since the trial court first approved Ms. Terry's investment plan and ordered Mr. Terry to pay support notwithstanding Ms. Terry's substantial portfolio of investments, the trial court found that Ms. Terry's investment plan remained sound, and that she was still receiving a reasonable rate of return on her investments.

The majority focuses on Mr. Terry's claim that Ms. Terry's separate estate was by the time of the 1998 modification proceedings "sufficient for [her] proper support" (§ 4322), and holds that this is a mixed question of law and fact, subject to de novo review. I disagree. The general rules of law and the standards of appellate review for an order modifying spousal support are well settled: "Modification of spousal support . . . requires a material change of circumstances since the last order. [Citations.] Change of circumstances means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. [Citations.] It includes all factors affecting need and the ability to pay. [Citation.] Appellate review of orders modifying spousal support is governed by an abuse of discretion standard, and such an abuse occurs when a court modifies a support order without substantial evidence of a material change of circumstances. [Citations.]" (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982-983 [48 Cal.Rptr.2d 864]; see also *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 76-78 [46 Cal.Rptr.2d 8]; *In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161 [13 Cal.Rptr.2d 799]; *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 458 [152 Cal.Rptr. 668], disapproved on other grounds, *In re Marriage of Lucas* (1980) 27

---

[5]I have no quarrel with the majority's decision to affirm the trial court's order denying Ms. Terry's request for attorney fees incurred in the 1998 modification proceedings. I also agree with the majority's decision to deny both parties' requests for attorney fees on appeal.

Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285].) The court in *In re Marriage of Aufmuth, supra,* 89 Cal.App.3d 446, emphasized the importance of judicial restraint in reviewing awards of spousal support, as follows: "In fixing the amount of spousal support to be awarded upon dissolution of marriage, broad discretion is vested in the trial court [citation], 'and thus an appellate court must act with cautious judicial restraint, even though the particular award might appear on appeal to be modest or *generous* under the particular circumstances.' [Citation.] However, the discretion of the trial court is not unlimited. '[I]t must be exercised along legal lines, taking into consideration the circumstances of the parties, their necessities, and the financial ability of the [obligor spouse].' [Citation.] An abuse of discretion will be perceived if, after calm and careful review of the entire record, it can fairly be said that no judge would reasonably make the same order under the same circumstances." (*Id.* at p. 458, italics added.)

When a party seeking modification of a spousal support invokes section 4322, however, the real issue is whether there has been a material change of circumstances such that the supported spouse's "separate estate" has become "sufficient for [his or her] proper support," and he or she is, thus, no longer entitled to any support (*ibid.*). This is a question of fact for the trial court (*In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845, 850-851 [194 Cal.Rptr. 176]), subject to review only to determine if there was substantial evidence to support the trial court's finding on the issue (*ibid.*; see also *In re Marriage of McCann, supra,* 41 Cal.App.4th at pp. 982-983). In conducting such review, we must accept as true all evidence supporting the trial judge's findings, resolve all conflicts in the evidence in favor of the prevailing party, and indulge in all legitimate and reasonable inferences to uphold the judgment. (See *In re Marriage of Rising* (1999) 76 Cal.App.4th 472, 474, fn. 2 [90 Cal.Rptr.2d 380], citing *In re Marriage of Stephenson, supra,* 39 Cal.App.4th at p. 82, fn. 5; *In re Marriage of Meegan, supra,* 11 Cal.App.4th at p. 161.) Applying this deferential standard of review, I cannot agree with the majority that the trial court erred in the most recent modification proceeding when it found that Ms. Terry's separate estate had not yet grown to the point that it was "sufficient for [her] proper support" and, thus, declined to terminate Mr. Terry's spousal support obligation. However, even if we were reviewing the sufficiency of Ms. Terry's separate estate under section 4322 using a de novo standard of review, I would not agree with the majority's conclusion, based on the record before us.[6]

A comparison of the statement of facts set forth in the majority opinion and the statement of facts set forth above demonstrates that both the relevant

---

[6]The confusion resulting from the majority's attempt to apply a de novo standard of review to what it calls a "mixed question of law and fact" is, perhaps, the product of a failure to differentiate between the issues of statutory interpretation it is deciding, and the application of the statute as interpreted to the disputed facts of this case. The former are clearly questions of

evidence before the trial court in the second modification proceeding, and the inferences to be drawn from that evidence, were *not* undisputed. Indeed, the parties hotly disputed almost every item of each other's income, expenses, property valuations, return on investments, earning capacity, etc. Of course, there were some general points as to which there was no controversy. For example, without any change in her investment strategy, the value of Ms. Terry's investments had steadily increased since the initial support order was entered, as had the income derived from those investments. Just as the rate of return on those investments had gradually dropped from a high point of 4 percent in mid-1995 to a low of 2.8 percent in early 1998, solely because of market forces. That is, the estimated market value of her Merrill Lynch portfolio had increased substantially—at least for the moment in the "crazy stock market" of the late 1990's—but the income generated by those investments had not grown at the same pace and was still not, by the time of the 1998 modification proceedings, sufficient to cover Ms. Terry's reasonable needs. However, at a minimum, the parties *sharply* disputed the reasonableness of Ms. Terry's investment strategy, and whether the trial court should have looked beyond the *actual* income she was receiving from her investments.

Now, the court might properly have imputed income to Ms. Terry if it had determined, as Mr. Terry contended, that Ms. Terry was not diligently and prudently managing her investments and that, if she were, she would be receiving a rate of return as high as 10 percent. (See *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902, 906 [243 Cal.Rptr. 179] (*McElwee*).)[7] Although not directly stated in the opinion, the majority apparently agrees with Mr. Terry—and would overrule the trial court's *finding of fact* to the

law subject to independent review. (*Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 350 [231 Cal.Rptr. 690].) The latter—at least in the present context—is " 'essentially factual' " and, thus, subject to the more deferential "substantial evidence" standard of review (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *In re Marriage of McNaughton, supra,* 145 Cal.App.3d at pp. 850-851; see also *Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 698, fn. 3 [139 Cal.Rptr. 700, 566 P.2d 602] [a determination is one of ultimate fact if it can be reached by logical reasoning from the evidence, and one of law if it can be reached only by application of legal principles]; and see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶¶ 8:2 to 8:5, pp. 8-1 to 8-3). As I will discuss, I believe the trial court correctly interpreted and applied section 4322 to the disputed facts of this case. Therefore, I would simply hold that the trial court's findings and order were supported by substantial evidence, and affirm.

[7]Alternatively, the trial court might have accepted Mr. Terry's argument that Ms. Terry was required to start drawing down her retirement account, which she received in the final division of the community property, or have a reasonable draw imputed to her as income. However, it did not, and Mr. Terry has failed to present any evidence or argument that would *require* the trial court to impute income to Ms. Terry based on her refusal to begin drawing on her retirement account.

contrary—that his ex-wife's separate estate was not being "reasonably managed." (See maj. opn., *ante*, at pp. 929-930 [trial court need not look beyond actual income where supported spouse's assets are being "reasonably managed"]; *id.* at pp. 931-932 [Ms. Terry must either change her investment strategy to generate more income or invade capital currently tied up in investment assets].) The problem with this position is that the trial court previously found, based on substantial evidence presented at trial in 1995, that Ms. Terry was *in fact* diligently and prudently managing her assets under an investment strategy she and Mr. Terry had *both* followed during their marriage pursuant to advice from an investment counselor, Don Hill, whom both parties had continued to employ even after separation. The court also found that, under that strategy, Ms. Terry was receiving a reasonable rate of return of approximately 4 percent on her investments and that she had to rely on professional investment advisors because of her lack of education and sophistication. Finally, the court found that adverse tax consequences would result from any attempt to reconfigure her investment portfolio to produce more income as urged by Mr. Terry's expert, Paul Violich. These findings were supported by substantial evidence and became final when Mr. Terry failed to appeal the 1995 support order. These findings should be presumed to have settled the issue of Ms. Terry's diligence and prudence in managing her investments, and could be deemed established in subsequent proceedings, absent evidence of a material change in circumstances since the order was entered. (See *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 8-9 [17 Cal.Rptr.2d 480]; *In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 411-413 [6 Cal.Rptr.2d 791] (*Biderman*); *In re Marriage of Farrell* (1985) 171 Cal.App.3d 695, 700 [217 Cal.Rptr. 397].)

Perhaps more importantly, the 1995 findings and order should be presumed to have settled—at least for purposes of this case—the issue of how the sufficiency of Ms. Terry's estate would be measured for purposes of section 4322. (See *Biderman, supra,* 5 Cal.App.4th at p. 411 [effort to extend limited-term spousal support order, which was based on findings that supported spouse could become self-supporting within period of support, was a "collateral attack" on the original support order, which was not challenged by appeal].) Apparently, the trial court used the same methodology in both the 1995 and the 1998 support proceedings to decide that issue, gauging the sufficiency of Ms. Terry's separate estate to provide for her proper support by measuring the *actual income* being generated by her separate property investments. As even the majority appears to recognize, at no time during these proceedings has Ms. Terry's *actual* investment income been sufficient to produce $120,000 to $144,000 in after-tax income. (See maj. opn., *ante*, at pp. 931-932.) At a minimum, Mr. Terry should be found to have waived any objection to the trial court's methodology by failing to seek review of the 1995 support order, which has long since become final.

In any event, it was Mr. Terry's burden, in the 1998 modification proceedings, to prove that Ms. Terry's separate estate had grown to the point that it had become sufficient for her proper support within the meaning of section 4322. (See *In re Marriage of Stephenson, supra,* 39 Cal.App.4th at p. 77 [moving party has the burden of establishing a material change in circumstances since the last order was made].) Plainly, however, Mr. Terry failed to carry his burden. He offered no new evidence to show what current market conditions were, what types of adjustments Ms. Terry could make to increase income, what additional risks and tax consequences she would suffer, or even what amount or range of income she might generate with a new and different financial plan. True, the capital gains rate had dropped from 28 to 20 percent but, without any evidence of how that rate would play out with a reconfiguration of Ms. Terry's portfolio, the trial court was not bound to find that Ms. Terry's long-standing investment strategy was no longer sound.[8]

As the court explained in its statement of decision following the 1998 modification proceedings: "Ms. Terry, of course, has substantial separate assets, primar[ily] low basis stocks, which she manages in a manner which does not maximize income. This strategy was approved by the trial Court in the Order on Reserved Issues, as well as in the 1996 modification proceeding. . . . [¶] The issues raised by this modification/termination proceeding are similar to those discussed in the 1996 proceeding. The Court is required to determine whether there has been a substantial change of circumstances and, if so, reconsider the factors of Family Code 4320 to determine the appropriate support, if any. [¶] The Court finds that there has been a substantial change of circumstances. Mr. Terry's employment has terminated, and Ms. Terry's separate assets have increased in value. Although the possibility of a termination of employment was known at the time of the earlier hearing, the Court declined to consider the possibility, choosing to focus on the circumstances at the time of the making of the earlier order. It is true that Mr. Terry apparently remains one of the leading employment benefit experts in the United States, but he is at or near retirement age. He has the right to cease working at some time, and rely on his assets and retirement income for his support. He has not chosen to do so, however, so consideration of his income remains necessary. [¶] The Court does not believe that there has been a showing sufficient to require Ms. Terry to start receiving her retirement benefits, *nor has there been a showing sufficient to require her to change her investment strategy.* The suggestion that Ms. Terry

---

[8]The majority would supersede the factual findings of the trial court with findings of its own, i.e., that (for reasons it does not explain) Ms. Terry's investment strategy is no longer reasonable, and that (somehow, again for reasons it does not explain) Ms. Terry's separate estate has reached a point that it is now "sufficient for [her] proper support." (§ 4322.)

purchase an annuity with the retirement proceeds is an interesting one, but it fails to consider her estate plan, and any desire she has to leave any remaining balance to her children. She may not be able to postpone indefinitely her drawing on her retirement accounts, but some indication that Mr. Terry is unable to support Ms. Terry is appropriate. In addition, other than Mr. Terry's hearsay statement, there is no admissible evidence that such an annuity is, in fact, available. *As to her stock portfolio, the Court has no indication of what would have to be sold, what the tax consequences would be, what increased risk there would be, and what her expected income would be.* [¶] *Considering Ms. Terry's investment strategy, which the Court is not prepared to disapprove at this time, Ms. Terry does not have a separate estate sufficient to give her proper support, as provided in Family Code 4322.*" (Italics added.)

Obviously, the trial court carefully considered all the relevant circumstances (as well as the factors set forth in § 4320) and—using the same methodology it had employed in the prior support hearings—resolved a number of hotly contested factual issues to find that Ms. Terry's separate estate was not yet sufficient to provide for her proper support.[9] This finding was supported by substantial evidence. Section 4322 plays a valid and important role in the proper determination of spousal support and I would not hesitate to invoke it, given the proper evidence. However, this is not such a case. Upon calm and careful review of the record, under the appropriate standards of review, this court should act with judicial restraint and uphold the trial court's order reducing, but declining to terminate, spousal support.

B. *Failure to Provide Guidance to the Trial Court*

The majority opinion also fails to provide the trial court with meaningful guidance for determining when a former spouse's "separate estate" is or has become "sufficient for [his or her] proper support" within the meaning of section 4322.[10] This error is traceable to the two flawed decisions of the Court of Appeal upon which the majority holding rests, and the majority's

---

[9]Another way of looking at the trial court's finding was as a determination that Ms. Terry had made reasonable, good faith efforts to become self-supporting (see §§ 4320, subd. (k), 4330, subd. (b)), but was not yet fully self-sufficient. This factor was added to the list contained in section 4320 after the first modification hearing (Stats. 1996, ch. 1163, §§ 1-2) and was, thus, considered for the first time in the 1998 hearing.

[10]As previously noted, these are primarily matters of statutory interpretation requiring this court to exercise its independent judgment to ascertain the meaning of the language used in section 4322. (*Simpson v. Unemployment Ins. Comp. Appeals Bd., supra,* 187 Cal.App.3d at p. 350.) Specifically, the trial court may need guidance (or at least clarification) as to the meaning of the terms "separate estate" and "proper support," as well as a clear methodology for determining when a spouse's separate estate is, or has become, "sufficient" to provide for that spouse's proper support. Of course, what constitutes "proper support" is not really at

unwillingness to consider other relevant authority that should guide its decision.

Citing *Dallman v. Dallman* (1959) 170 Cal.App.2d 729 [339 P.2d 636] (*Dallman*), the majority suggests that the trial courts should look to the "estate as a whole," including the "actual and reasonable income potential from investment assets, as well as their total value." (Maj. opn., *ante*, at p. 930.) In relevant part, the *Dallman* court said the trial court erred when it found that the wife's separate estate of nearly $500,000 was not sufficient for her proper support because, "disregarding any income [the estate] might produce," her separate property would support her at the $1,600-per-month claimed need level for more than 25 years. (170 Cal.App.2d at pp. 735, 737.) The import of the majority's citation of *Dallman* is unclear. The quoted language is sheer dictum. (*Id.* at pp. 736-738 [holding that there was no competent proof to support the items of expense claimed by the wife, and that husband clearly did not have the ability to pay even the $720 in support ordered by the trial court].) If it constituted a holding with precedential value, however, it would stand for the proposition that a supported spouse may be required to invade the principal of his or her separate property assets before he or she may be found to qualify for support. Alternatively, it might mean that a trial court should ascertain the life expectancy of the supported spouse, and divide the value of that spouse's separate estate by the number of years remaining in the spouse's life. Presumably, if the capital in the separate estate would not be depleted within the supported spouse's expected life span, the trial court should find that the estate is sufficient for the spouse's proper support and, accordingly, deny an initial request for support or terminate any existing support order.

But the majority would go even further than the language quoted from *Dallman* would suggest, and require the trial court to *aggregate* the supported spouse's separate property and the community property awarded in the final division of marital property, when assessing the sufficiency of the supported spouse's "separate estate" to provide for his or her "proper support." (§ 4322.) (Maj. opn., *ante*, at p. 930.) Then, once the value of the aggregated assets has been determined, the majority would have the trial

issue in this case. Ms. Terry does not seriously dispute that after-tax income of at least $120,000 per year will provide her with proper support. As I have already noted and will elaborate, *post*, I believe the trial court understood and correctly applied well-established principles of California case law when it determined that Ms. Terry's separate estate was *not* "sufficient for [her] proper support" because, although it was being prudently managed, it was not producing sufficient income to meet her reasonable needs as determined in the prior support proceedings. Thus, the central question presented in this appeal is really one of ultimate fact which, as discussed in part A, *ante*, was correctly resolved by the trial court based on substantial evidence.

court look to the "totality of the facts" to determine whether the estate is sufficient to provide for his or her proper support. (Maj. opn., *ante*, at pp. 931-932.)[11] The majority relies on *Biderman, supra*, 5 Cal.App.4th 409, as support for its approach. (Maj. opn., *ante*, at pp. 930-931.)[12]

Now, it is true that some California cases seem to require—albeit without any real analysis—aggregation of separate property and community property assets awarded in the final division of the marital property when making the determination whether a spouse's " 'separate estate' " is " 'sufficient [for his or her] proper support' " within the meaning of section 4322. (*Biderman, supra*, 5 Cal.App.4th at p. 411; *McElwee, supra*, 197 Cal.App.3d at p. 906; *In re Marriage of Cosgrove* (1972) 27 Cal.App.3d 424, 427, 434 [103 Cal.Rptr. 733]; see also Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1999) ¶ 6:977, p. 6-347.)[13] However, other courts have expressly refused to consider income derived from community property awarded to the supported spouse in the division of the marital property when deciding whether to deny, reduce, or terminate support; and numerous other cases have held that a supported spouse is not required to invest and manage his or her estate so as to maximize income, or to invade capital (especially where the capital asset was community property awarded to the supported

---

[11]The majority states several times that section 4322 references the estate as a whole, not just the income produced by it, and seems to intimate that the trial court should look to both in determining if the supported spouse has a sufficient separate estate. (See maj. opn., *ante*, at p. 930 ["The statute references the estate, not just the income from the estate"; *ibid.* [". . . the court should look to the estate as a whole, including the actual and reasonable income potential from investments assets, as well as their *total* value, in resolving the issue of the estate's sufficiency for proper support" (italics added)].) Yet the majority never addresses in what way the total of the estate assets should be considered by the trial court.

[12]The majority provides an accurate synopsis of the facts and procedural history of *Biderman*, but fails to note that the *Biderman* court concluded, essentially as a matter of law but without any meaningful analysis, that an estate of $350,000 was sufficient to support the permanently disabled husband in that case. (5 Cal.App.4th at p. 414.) It is worth passing notice that, in that regard, *Biderman* has been criticized as "simplistic" by at least one leading family law treatise author. (2 Adams, Cal. Family Law Practice (14th ed. 1999) Spousal Support, § N.97.0.5, pp. N-73 to N-74.)

[13]It should be noted, however, that *McElwee and Cosgrove* involve, respectively, a termination (after 16 years of support following 15 years of marriage) and an initial denial (where both spouses were physicians, and corporate stock awarded to the spouse seeking support was *actually* producing sufficient income to cover her expenses) of spousal support, based on a trial court findings of fact—plainly supported by substantial evidence—as to the *sufficiency* of the separate estate of the spouse seeking a support. (*McElwee, supra*, 197 Cal.App.3d at p. 906; *In re Marriage of Cosgrove, supra*, 27 Cal.App.3d at pp. 427, 434.) *McElwee* also involved a finding of "imprudent" investments by the supported spouse and, thus, the trial court imputed to her the income she would have had if she had exercised reasonable diligence in managing her estate. (*McElwee, supra*, 197 Cal.App.3d, at p. 906.) *Biderman*, too, may be viewed as a case of a supported spouse failing to use reasonable diligence in managing his investments to become self-supporting, as the trial court had previously found he could, after 12 months of permanent support. (*Biderman, supra*, 5 Cal.App.4th at pp. 413-414.)

spouse in the division of the marital property) to meet his or her current support needs. (*In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1199, 1201 [280 Cal.Rptr. 565]; *In re Marriage of Kennedy* (1987) 193 Cal.App.3d 1633, 1640 [239 Cal.Rptr. 151]; *In re Marriage of Norvall* (1987) 192 Cal.App.3d 1047, 1061 [237 Cal.Rptr. 770]; *In re Marriage of Rabkin* (1986) 179 Cal.App.3d 1071, 1081 [225 Cal.Rptr. 219]; *Sammut v. Sammut* (1980) 103 Cal.App.3d 557, 563-564 [163 Cal.Rptr. 193]; *In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 635 [120 Cal.Rptr. 654]; *Buehler v. Buehler* (1946) 73 Cal.App.2d 472, 475-476 [166 P.2d 608]; *Farrar v. Farrar* (1920) 45 Cal.App. 584, 586 [188 P. 289].) Indeed, except where there is a showing of a lack of prudence and diligence in managing investments (see, e.g., *Biderman, supra,* 5 Cal.App.4th at pp. 413-414; *McElwee, supra,* 197 Cal.App.3d at p. 906), or purposeful minimization of income (see, e.g., *In re Marriage of Roesch* (1978) 83 Cal.App.3d 96, 102-103 [147 Cal.Rptr. 586] [trial court did not abuse its discretion by awarding relatively small amount of spousal support where wife requested and received high-value, non-income-producing assets in the marital property division]), it appears that California courts *do look only to actual income* produced from the supported spouse's assets when deciding whether the trial court abused its discretion by making or extending a particular spousal support order, including one challenged under section 4322 (see, e.g., *In re Marriage of McNaughton, supra,* 145 Cal.App.3d at pp. 850-853).

A brief examination of this body of case law is in order. In *Buehler v. Buehler, supra,* 73 Cal.App.2d 472, the court held, "The law is settled in California that when a wife is the owner of nonincome producing property, she is not required to have recourse to such property for her support before seeking support from her husband." (*Id.* at pp. 475-476, citing *Farrar v. Farrar, supra,* 45 Cal.App. at p. 586 [same; nor is wife required to "impair the capital of her separate estate"].)

More recently, in *In re Marriage of Martin, supra,* 229 Cal.App.3d 1196, the court held that a wife was not required to buy income-generating investments with $209,500 she received from her husband's buyout of her share of the community property in order to qualify for support. (*Id.* at p. 1201.) It was sufficient that the trial court had attributed to the wife an annual income of $8,000 from interest she was actually receiving on those funds. (*Id.* at pp. 1199, 1201.) In support of this holding, the *Martin* court relied on dictum from *In re Marriage of Kennedy, supra,* 193 Cal.App.3d 1633, where the court observed that a trial court has no authority to order a spouse to invest his or her community property share or face loss of support. (*Id.* at p. 1640.) The *Martin* court also cited *In re Marriage of Kuppinger, supra,* 48 Cal.App.3d 628, which held that a supported spouse need not

convert capital assets into income-producing investments in order to qualify for continued support. (*Id.* at p. 635.)

In *In re Marriage of Norvall, supra,* 192 Cal.App.3d 1047, the court held that the trial court abused its discretion by reducing a wife's spousal support, in part because of income she had begun receiving from a community property asset that was awarded to her in the parties' property settlement. (*Id.* at p. 1061.) The *Norvall* court, too, relied on *Kuppinger* in support of its holding on this point. (*Ibid.*)

In *In re Marriage of Rabkin, supra,* 179 Cal.App.3d 1071, the court held that, in light of the parties' agreement that sale of the family home would not be a "change of circumstances," the trial court abused its discretion by reducing support for the wife after the house was sold. (*Id.* at p. 1081.) It was also error to count, as "additional funds available" to the wife, the proceeds from the sale of an undeveloped lot she received in the division of the community property. (*Id.* at pp. 1081-1082.) The court explained: "The transformation of one nonincome-producing asset into another constitutes no basis for a modification of spousal support." (*Id.* at p. 1082.)

Finally, in *Sammut v. Sammut, supra,* 103 Cal.App.3d 557, the court held that income the supported spouse had begun receiving from the sale of stock she was awarded as part of her share of the community property could not be attributed to her for purposes of determining whether an upward modification of spousal support was warranted. (*Id.* at pp. 563-564.)

Perhaps because of the foregoing body of case law, the majority stops short of announcing a clear rule as to how the trial court should analyze the "totality of the facts" before it. Perhaps the majority means to say that the trial court should have applied some "reasonable rate of return" to the *aggregate* value of the supported spouse's separate property and community property assets. (Maj. opn., *ante,* at pp. 930-931.) In my view, the line of cases beginning in 1920 with *Farrar v. Farrar, supra,* 45 Cal.App. 584, and continuing through 1991 with *In re Marriage of Martin, supra,* 229 Cal.App.3d 1196, precludes aggregation of Ms. Terry's community property assets (the Kentfield house, the retirement accounts) with her separate property assets (the Merrill Lynch portfolio and the note from her son, which is traceable to separate property funds previously held in the Merrill Lynch account). However, using the figures cited in the factual summary set forth at the beginning of this dissenting opinion, it would not be unreasonable for the trial court to consider both the face value of the Merrill Lynch account and the face value of the note from her son—a total of approximately $3.75 million—when assessing the sufficiency of her "separate" estate to provide

for her proper support. Applying a factor of 4 percent to determine a "reasonable rate of return" from those investments, the result is $150,000 in gross income *theoretically* available to Ms. Terry from those assets. But without any evidence about the taxable portions of that income and the applicable tax rates—not to mention evidence of any viable strategy by which Ms. Terry might overhaul her financial plan to generate a higher return from these assets—it is impossible to determine whether this amount is sufficient to generate the $120,000 to $144,000 in after-tax income required to meet Ms. Terry's reasonable needs. A fortiori, it is impossible to understand how on this record the majority can conclude, essentially as a matter of law and *without specifying its methodology, that Ms. Terry's separate estate is now sufficient to provide for her proper support within the meaning of section 4322.

### C. *Ms. Terry's Entitlement to a Gavron Warning*

One final issue is whether Ms. Terry was entitled to a warning and a reasonable opportunity to rearrange her investments before she could be required to become entirely self-supporting. (See §§ 4320, subd. (k), 4330; *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705 [250 Cal.Rptr. 148].) As previously noted, no such warnings were given by the trial court until the most recent modification order issued in May 1998. In that regard, the trial court said: "This does not mean that Ms. Terry cannot, *under a proper showing*, be required to change her investment strategy or risk being imputed the income she could receive. The policy of the law expressed in Family Code [section] 4320(k), and the admonition required by Family Code [section] 4330 apply to Ms. Terry, even if the Court determines that she is unable to become self-sufficient through employment." (Italics added.)

The majority does not cite, much less discuss, *Gavron* or the concern for fairness underlying the requirement of a warning before terminating spousal support.[14] On the contrary, the majority criticizes the trial court for its "reticence" to terminate support (maj. opn., *ante*, at pp. 931-932) despite the fact that, after the dissolution of a 34-year marriage, the court carefully examined the parties' circumstances three times in less than three years, found that Ms. Terry was still in need of support to meet her reasonable needs (as established during that very long-term marriage), and only at the most recent hearing found that the issue was close enough to warn Ms. Terry

---

[14]The majority addresses this issue by merely indicating that "Ms. Terry has been aware of the court's independent authority under section 4322 since entry of the first support order. Nothing more could be achieved by warnings because section 4322 applies, and its operation is mandatory, whenever a spouse has, or acquires, a separate estate adequate for proper support." (Maj. opn., *ante*, at p. 932, italics omitted.)

of the possibility she might soon be called upon to be entirely self-supporting. The majority's decision to terminate support without warning—based on its own view of the evidence and without even so much as a nod to the deference trial courts deserve in such matters—simply cannot be reconciled with *Gavron*.

In any event, as appellant was *twice* reassured by the trial court that her investment strategy was reasonable, and had never before been given a *Gavron* warning, it would have been an abuse of discretion for the trial court to terminate support. A fortiori, it is inappropriate for this court to do so.

CONCLUSION

The May 1998 order by which the trial court denied Mr. Terry's request to terminate spousal support pursuant to section 4322, but reduced the amount of support he must provide to Ms. Terry, should be affirmed. If not, the trial court should at least have an opportunity to reconsider the evidence in this case, including any additional evidence Mr. Terry may wish to produce to meet his burden of proof and any additional evidence Ms. Terry may wish to produce in rebuttal, under the rules established by the majority for determining whether Ms. Terry's separate estate was sufficient for her proper support at the time of the modification proceedings. Thus, at a minimum, a remand for further proceedings is in order.

The petition of appellant Mary E. Terry for a rehearing was denied May 16, 2000, and the petition of respondent Thomas D. Terry for a rehearing was denied May 16, 2000. Sepulveda, J., was of the opinion that the petition of appellant Mary E. Terry should be granted.The petition of appellant Mary E. Terry for review by the Supreme Court was denied July 26, 2000.