Filed 9/28/23  Marriage of Lemos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of ANNETTE and FRANK LEMOS. | |
| ANNETTE LEMOS,<br><br>Appellant,<br><br>v.<br><br>FRANK LEMOS,<br><br>Respondent. | F083656<br><br>(Super. Ct. No. 8008163)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Kellee C. Westbrook and Marcus L. Mumford, Judges.*

Complex Appellate Litigation Group, Kirstin M. Ault, Robert A. Roth and Kelly A. Woodruff for Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Scott M. Reddie and Betty L. Julian for Respondent.

-ooOoo-

---

\*      Judge Westbrook issued the Amended Final Statement of Decision on September 14, 2021; Judge Mumford entered the judgment on November 8, 2021.

Appellant Annette Lemos appeals from the trial court's amended final statement of decision in the dissolution proceedings with respondent Frank Lemos. Appellant focuses her appeal on three issues. First, appellant challenges the trial court's decision not to award spousal support following dissolution. Second, appellant challenges the trial court's decision to have the parties pay for their own outstanding attorney fees following dissolution. Third, appellant challenges the date upon which the trial court valued certain investment accounts awarded to appellant. For the reasons set forth below, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Appellant and respondent married in 1981, raised three children who are now adults, and entered into multiple business ventures together. In 2017, after 36 years of marriage, the two separated, and their marriage was formally dissolved in 2021.

The parties were financially successful during the course of their marriage. Respondent started and successfully ran an electrical business known as Brite Electric. The business included two properties and was the parties' primary source of income. Appellant left the job she had when the parties married and eventually handled bookkeeping duties for Brite Electric, along with all of the parties' eventual businesses.

The parties also purchased agricultural land known as the "Pepper Property" that was used, in part, to start a dairy and upon which the parties lived. The parties also bought two additional properties that they used as farmland and for the dairy nearby the Pepper Property.

The parties' financial success led to additional purchases over time. These included vacation homes known as the "Large Cabin" and the "Small Cabin," as well as the purchase of respondent's mother's home. In addition, the parties purchased a mini-market business known as "M&M market," as well as a restaurant known as "Table 26." As would be expected of individuals with substantial means, the parties also collected a substantial amount of personal property both for themselves and for their businesses, along with several related income streams.

Of course, the parties also assumed debts related to these endeavors. Most significantly, the parties incurred a substantial income tax debt that arose partially because the bookkeeping duties managed by appellant were overwhelming and thus not completed properly. This debt rose to around $2.5 million.

The complexity of the case, both financially and personally, and the significant tax debt necessitated the hiring of a court-appointed receiver to handle the ongoing community businesses during the dissolution proceedings. This receiver was appointed in 2019 and recommended the sale and lease of certain properties to offset some of the parties' debt. The remaining debt was offset through a loan taken against the dairy for roughly $3.2 million. The parties agreed that the excess borrowed above the remaining debt, approximately $1.2 million, should be awarded to appellant as an advance on future equalizing payments. This amount was provided to appellant in February 2020.

After multiple settlement conferences, the court began the dissolution trial in late January 2020, with the expectation that the parties could reach a global settlement if the court were to resolve disputes regarding the Pepper Property, farmland, and dairy. This hope proved naïve, as the parties found they had many more disputes to settle. The court therefore scheduled several more hearings and eventually issued a tentative statement of decision in May 2021. In total, over multiple sessions, the court held trial for 23 days, with the last day of live testimony occurring on January 21, 2021. Following the tentative statement of decision, the parties identified additional issues that needed to be resolved and submitted additional evidence and argument in support of these issues. The court then reviewed these records and issued an extensively detailed and roughly 25-page amended final statement of decision on September 14, 2021.

The court's amended final statement of decision detailed the parties' histories, their properties and debts, certain relevant disputes remaining regarding their conduct through the marriage and dissolution proceedings, and the history of the case. Appellant was awarded the large and small cabins, M&M market, including its related property and

debt, certain items of personal property, including certain brokerage accounts which the court would value as of June 20, 2021, and the prior equalization payment. Notably, the parties stipulated that the value of M&M market was $2.4 million.

Respondent received the remaining properties along with their debt, Brite Electric and its related assets, and certain personal property. The court determined that respondent's expert provided a better reasoned analysis regarding the value of Brite Electric, based on her use of multiple valuation methods showing roughly similar valuations and her exclusion of outlier data, while appellant's expert utilized only a single valuation method that relied on comparable data that focused on the highest earning year for the business. It thus valued Brite Electric, exclusive of its property, at approximately $1 million.

Ultimately, the court awarded roughly half of the estate to each party but found an additional equalizing payment from respondent to appellant was required in the amount of roughly $650,000. This payment was required to either be made in full by September 2021 or in payments over the course of seven years at an initial 6 percent rate of interest that would then be adjusted for inflation. The total assets received by each party was slightly less than $6 million.

Relevant to the issues on appeal, after dividing the assets and resolving other outstanding disputes, the court conducted a spousal support analysis under Family Code section 4320.[1] The court identified each factor listed under section 4320 by its subdivision, utilizing an (a) through (n) structure, and provided comments or thoughts on each subdivision. After going through the factors, the court provided an additional paragraph of analysis through which the court set spousal support at "zero," based on the fact that appellant was receiving additional cash assets and would receive "between

---

[1]     Undesignated statutory references are to the Family Code.

4.

$10,500.00 and $14,728.00 per month" from M&M market, an amount that "exceed[ed] [appellant's] needs and requests."

The court then proceeded to consider whether to award attorney fees. The court provided a brief overview of the law and noted the relevance of section 2032. The court then detailed the extent of attorney fees already paid by the community, noting that to that point the community had paid a slightly higher percentage of respondent's fees and ordering the community split that current difference. Having equalized the percentage paid by each side to the point of the order, the court referenced its analysis of the section 4320 factors and held "each party shall be individually responsible for any outstanding balances and post-trial charges by their respective attorneys." The court explained it was "mindful" that although respondent was "to eventually have more cash flow via Brite Electric, respondent did not receive any liquid assets and has been delegated every single debt aside from" the note on one property awarded to appellant. Despite this, the court found both "parties appear to be able to arrange for remaining payment to their attorneys."

Based on these findings, judgment was eventually entered on November 8, 2021. This appeal timely followed.

## DISCUSSION

Appellant's arguments focus on the denial of spousal support, the denial of additional attorney fees, and the valuation date of certain assets. Notably, appellant's arguments regarding the award of attorney fees relies upon its claims that the trial court erred in denying spousal support. Although we consider each argument in turn, we note that our discussion regarding the award of spousal support and the errors alleged in that analysis is equally applicable to the decision regarding attorney fees. In addition, shortly before oral argument, respondent moved to dismiss this appeal under the disentitlement doctrine. Before reaching the merits, we first consider that motion.

_**Motion to Dismiss**_

On August 2, 2023, respondent filed a motion seeking to dismiss this appeal. Respondent claims appellant repeatedly violated orders from the trial court related to the resolution of the parties' positions in the dissolution proceedings and identified four specific examples: (1) a failure to transfer certain accounts into her name; (2) a failure to execute a required deed; (3) a failure to turn over family photographs in response to a court order; and (4) a failure to cash checks written to her. Respondent noted that these issues had been raised with the trial court, that appellant had been sanctioned $35,625, and that appellant had not yet paid that sanction. In issuing the sanctions award, the trial court implied a belief that appellant was considering the court's orders to be suggestions and was not properly following the court's orders. Respondent notes that proceedings on these issues are still pending before the trial court and requests this court dismiss appellant's appeal under the disentitlement doctrine. Respondent's motion was submitted with supporting declarations and exhibits.

On August 16, 2023, appellant filed her response. Appellant argues that application of the disentitled doctrine would be inequitable in this case given the limited nature of the past offenses and notes that not only had those offenses been fully cured prior to the filing of the motion to dismiss, but also that the sanctions payment was resolved shortly after the motion was filed when the trial court granted respondent a credit against the equalization payments he was required to make to appellant. Appellant argues the motion is both moot and without merit. Appellant's response was submitted with a supporting declaration and exhibits, including a reference to a supplemental declaration submitted by respondent on August 3, 2023, regarding the resolution of the sanctions payment.

"The disentitlement doctrine enables an appellate court to stay or to dismiss the appeal of a party who has refused to obey the superior court's legal orders. [Citation.] 'Dismissal is not " 'a penalty imposed as a punishment for criminal contempt. It is an

6.

exercise of a state court's inherent power to use its processes to induce compliance' "

with a presumptively valid order.' [Citation.] Thus, the disentitlement doctrine prevents

a party from seeking assistance from the court while that party is in 'an attitude of

contempt to legal orders and processes of the courts of this state.' " (*In re Marriage of

Hofer* (2012) 208 Cal.App.4th 454, 459 (*Hofer*).)

"The disentitlement doctrine has been applied to a wide range of cases .…"

(*Gwartz v. Weilert* (2014) 231 Cal.App.4th 750, 758 (*Gwartz*).) The most common type

of case involves a party actively failing to comply with a valid postjudgment order. (See

*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 266–267

[violation of settlement agreement barring the appellants from transferring stock];

*Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1230–1232 [citing

similar cases in situation where the appellants failed to respond to postjudgment

discovery request]; *Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683–1684,

1690–1691 [citing similar cases in situation where the appellants failed to pay fines and

comply with posttrial receiver order].)

However, the doctrine is not limited to postjudgement conduct and can be used to

dismiss appeals arising out of egregious prejudgment conduct. For example, "[w]here a

party unlawfully withholds evidence of his income and assets, he will not be heard to

complain that an order is not based on the evidence he refuses to disclose. If [the

appellant] wished the trial court to have considered all of the circumstances in making an

attorney fee award, the simple solution would have lain in his own hands: disclose the

information. But instead [the appellant] closed the door to an appeal from the trial

court's order and threw away the key." (*Hofer*, *supra*, 208 Cal.App.4th at pp. 458–459.)

Further, the disentitlement doctrine is not constrained by formalities such as

explicit contempt findings. (*Stoltenberg v. Ampton Investments, Inc.*, *supra*,

215 Cal.App.4th at p. 1230 ["No formal judgment of contempt is required; an appellate

court 'may dismiss an appeal where there has been *willful disobedience or obstructive*

7.

*tactics.*' "].) Consistent with this broad concept, cases like *Gwartz* and *Hofer* note the doctrine is not only used for violation of court orders, but is also broadly applied to those in an attitude of contempt for legal processes or otherwise engaged in obstructive tactics. (*Gwartz*, *supra*, 231 Cal.App.4th at p. 758; *Hofer*, *supra*, 208 Cal.App.4th at p. 459.)

In this case, the respondent contends appellant is demonstrating an attitude of contempt warranting dismissal through her failure to produce photographs and her failure to execute documents as ordered by the trial court. Relatedly, appellant is alleged to have failed to cash certain checks, causing problems for respondent in tracking his remaining debt owed to appellant. Notably, aside from being relatively minor, none of these failures relate directly to an issue raised in the appeal. Finally, respondent relies on appellant's failure to pay sanctions when ordered. However, that issue was resolved almost immediately after it was raised when the trial court reduced the debt respondent owed to appellant.

Although appellant suggests this motion is moot, that is not correct. As shown in *Hofer*, resolution of disputes by the trial court does not necessarily preclude a disentitlement motion. However, even viewing appellant's conduct holistically, the issues below appear much more aligned to the emotionally and financially complex nature of the proceedings than to any specific refusal to abide by the authority of the trial court. The court finds no basis to conclude appellant's conduct rises to the level of contempt to the court that would warrant dismissal. The motion to dismiss is therefore DENIED.

## **_Denial of Spousal Support_**

Appellant contends the trial court erred as a matter of law, and thus abused its discretion, when denying appellant's request for spousal support. First, appellant argues the court wrongly determined respondent's ability to pay support. Second, appellant alleges the trial court wrongly determined appellant could meet her reasonable needs and maintain the marital standard of living without support. Finally, focusing just on the

abuse of discretion standard, appellant claims the trial court's failure to award spousal support was neither just nor equitable considering the circumstances.

*Standard of Review and Applicable Law*

" ' "Permanent spousal support 'is governed by the statutory scheme set forth in sections 4300 through 4360.  Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320.' [Citations.]  The statutory factors include the supporting spouse's ability to pay; the needs of each spouse based on the marital standard of living; the obligations and assets of each spouse, including separate property; and any other factors pertinent to a just and equitable award. (§ 4320, subds. (c)–(e), (n).)" '  [Citation.]

" ' " 'In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it.  "The issue of spousal support, including its purpose, is one which is truly personal to the parties." [Citation.]  In awarding spousal support, the court must consider the mandatory guidelines of section 4320.  Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion.  [Citation.]  "Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders." ' " [Citation.]  An abuse of discretion occurs " 'when it can be said that no judge reasonably could have made the same order.' " ' " (*In re Marriage of Maher & Strawn* (2021) 63 Cal.App.5th 356, 363, second bracketed insertion added.)

*Respondent's Ability to Pay Argument*

Appellant's first argument relies on a contested interpretation of the trial court's order.  Appellant argues "the court found [respondent's] available cash was completely

offset by his debt in the form of the AgCredit Loan and the … equalization payment." Appellant asserts such a conclusion was improper because the equalizing payment could not be considered a debt and because the evidence showed respondent's available income had already accounted for these alleged debts. Respondent, however, reads the court's order differently. According to respondent, the trial court was aware that respondent had available income to pay spousal support, but concluded an award was unnecessary based on factors other than respondent's income being insufficient to support the award.

The trial court in this case provided a detailed amended final statement of decision that specifically considered the various factors enumerated in section 4320. Appellant's argument derives from the court's discussion of subdivision (e), which detailed the "obligations and assets, including the separate property, of each party." There, the court wrote the following:

"Each party is receiving equity of over five million dollars. Utilizing her pre-distribution, [appellant] has a separate property home that is worth approximately $780,000 and a lot worth $50,000.00, an annuity in the amount of $50,000.00, and $100,000.00 in gold coins. This left $300,000.00 of the $1.28 million pre-distribution. Additionally, through the division of the community property, [appellant] will receive an equalizing payment of about $650,000.00 that can be utilized for living expenses or for investing (presumably with a return) or will receive payments on a promissory note. Additionally, she has been awarded two vacation properties totaling $1.123 million that she can sell or rent or reside. [Fn. omitted.] [Appellant] was additional[ly] awarded [M&M market]. If [appellant] acts as the store manager, her net cash flow from that business is about $15,000.00 per month. [Fn. omitted.] Once the Mello note is paid off, [M&M] market will generate approximately $16,000.00 *more* per month in net cash flow. [Fn. omitted.] She can opt to sell the business. It currently has approximately $1.7 million in equity.

"Respondent, per his own expert, estimates his monthly available cash flow to be about $36,000.00. Respondent has been awarded the three ag properties, two homes, a million-dollar business, two office/shops, and various personal property. However, he also has a $3,000,000.00 encumbrance and an over $600,000.00 equalization payment due to [appellant]. He does not any [*sic*] available substantial cash or retirement funds, and he has taken on all of the debt."

Upon review of the trial court's language, we discern no support for appellant's assertion that the trial court concluded respondent's cash flow was offset by his debt payments, effectively rendering him with no disposable income. The court specifically noted respondent's cash flow was $36,000 based on respondent's own expert's testimony, which appellant correctly notes already included offsets for the existing debt. A fair reading of the court's discussion regarding respondent's obligations and assets does not indicate a finding that respondent lacked available cash to pay spousal support. Rather, the court directly acknowledged the existence of $36,000 in monthly income. In context, the court's statement that respondent "does not any [*sic*] available substantial cash or retirement funds" is not a monthly cash flow issue, but rather a total asset issue— essentially a recognition that appellant had received and could still expect substantial cash assets with no debt and respondent would not, but that respondent would receive greater immediate cash flow than appellant.

Moreover, in other statements made by the trial court, it is apparent that the trial court did not base its decision on a finding that respondent lacked adequate income to pay support if ordered. For example, in the analysis section following discussion of each of the statutory factors, the trial court focused exclusively on appellant's income and potential income from the funds and property awarded. The court specifically found that adding the prior equalization payment and the remaining equalizing payment, which could be invested, together with the $10,500 to $14,728 in cash flow from M&M market, would "exceed[ ] [appellant]'s needs and requests" even "without selling or renting out

11.

any of her assets." Similarly, in its discussion regarding attorney fees, the trial court provided a reworded version of the statement regarding asset and debt allocation contained in the spousal support discussion when writing, "although [respondent] is to eventually have more cash flow via Brite Electric, respondent did not receive any liquid assets and has been delegated every single debt aside from the Mello Note." The court's end analysis shows it considered appellant's income to be sufficient to maintain a proper standard of living without reference to respondent's ability to pay. And the court's reworded assessment of the existing distribution aligns with this court's understanding of the trial court's order—that respondent had been awarded an immediate cash flow that would increase over time but that this came at the expense of not having any remaining reserve cash assets.

Based on the record presented, this court finds no basis to conclude the trial court erred in assessing respondent's ability to pay spousal support.

*Appellant's Reasonable Needs Arguments*

We thus turn next to appellant's second claim, that the trial court wrongly determined appellant could meet her reasonable needs without support. Within this argument, appellant contends the trial court made two errors. First, that the trial court required appellant to utilize the principle of the assets awarded to her in the settlement to maintain her standard of living. And second, that the trial wrongly determined M&M market's future earning potential. We find no error under either argument.

Appellant's first argument is structurally similar to the claim above that the trial court wrongly calculated respondent's ability to pay support in that it relied on interpretations of the trial court's order for support. Focusing primarily on the discussion of obligations and assets noted above, appellant first points to the trial court's statement that appellant would "receive an equalizing payment of about $650,000.00 that can be utilized for living expenses or for investing (presumably with a return) or will receive payments on a promissory note." Later supplementing her argument with references to

12.

statements by the trial court that appellant could "*sell* or rent or reside" in her awarded vacation properties, appellant could "opt to sell" M&M market to tap its $1.7 million in equity, and the fact that appellant still had $300,000 in cash assets from the $1.28 million pre-distribution, appellant contends the court failed to consider the amount of actual income available to appellant in favor of a presumption that the assets awarded to appellant were sufficient to sustain her lifestyle.

Appellant extrapolates from the above statements that the trial court expected her "to liquidate her assets and use the cash she received in the property distribution, including the equalizing payment, to pay her living expenses." Appellant contends such actions would run afoul of well-settled principles holding that a spouse should not be forced to invade their portion of the community assets to pay for spousal support that can be provided by the other spouse. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 313 [finding error to the extent support order required supported party utilize principal assets to provide for their support when other party can afford to pay].)

Again, however, the trial court's overall order does not support such a reading. The court first found that the parties, although having substantial assets, were often cash poor during their marriage, resulting in "an upper middle-class lifestyle." The court then noted that appellant had been receiving between $11,000 and $15,000 per month from the community during the proceedings and had similarly requested roughly $15,000 per month in support, an amount far exceeding the $1,800 per month requested by respondent. In this context, the trial court reviewed appellant's assets post-separation, noting appellant had received a $1.28 million dollar equalizing payment, received two vacation properties, and was still entitled to an equalizing payment of approximately $650,000.00, while also finding that appellant would "receive approximately $10,500.00" per month from M&M market if she hired a manager and "about $15,000.00 per month" if she ran the market herself. The court went on to note that appellant could likely find some form of employment if needed and that she had made a willful choice not to invest

13.

her initial pre-distribution payment but rather had purchased another vacation home in Oregon, despite the possible need for a home in the area. This later observation essentially correlated with the trial court's note that appellant's financial requests included $3,000 per month for a mortgage.

Taking the statutory factors into account, the court then wrote that appellant "will receive either a lump sum of approximately $600,000.00 that she may invest, or she will, via a promissory note, receive an additional $9,400.00 per month for the next seven years. Additionally, it is anticipated that the cash flow from [M&M market] will be between $10,500.00 and $14,728.00 per month. This, combined with the equalization payment, exceeds [appellant]'s needs and requests." We see nothing within this final statement, even taking into account the contested statements from the court's consideration of the relevant statutory factors, that would indicate the trial court wrongly concluded appellant would need to utilize the principal value of her awarded assets to reach her marital standard of living. Accordingly, we see no error in the trial court's determination that appellant's needs were met upon the dissolution of the parties' assets.

The court's overall analysis concluded that appellant was entitled to an upper middle-class lifestyle that likely required between $11,000 and $15,000 per month in income to achieve. It then found that the income available from the assets already awarded to appellant were sufficient to meet that standard. Notably, the existence of a presumed range of income necessary to meet the marital standard of living did not mean the trial court had to identify income sufficient to meet that figure when determining whether spousal support was required. (See *In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 424–426 [trial court did not need to specify an amount of income needed to maintain the marital standard of living and could determine generally whether or not income available was sufficient to meet the adopted marital standard of living].) Even if such a requirement did exist, the evidence identified by the trial court was

14.

sufficient to reasonably conclude that appellant could satisfy her requested income level from the assets already awarded.

As the trial court noted, appellant's primary source of income was derived from a business that was already operating under the guidance of a court-appointed manager. M&M market was capable of generating between $10,500.00 and $14,728.00 per month, depending on whether appellant chose to hire someone to manage the market in her absence. This income, alone, was sufficient to roughly match appellant's stated needs for maintaining the marital standard of living without consideration of any other assets. However, as the court noted, appellant had already received an equalizing payment of $1.28 million and was scheduled to receive another $650,000, either in a lump sum or payments that could also be invested, and carried with them at least 6 percent in interest already. The court also noted that appellant chose not to invest her initial equalizing payment or wait to determine what needs may arise from the division of assets, but instead purchased yet another vacation home along with other items, leaving only $300,000 in cash. Looking over these assets and the existing income, the trial court concluded no further support was needed.

Although appellant argues no evidence was submitted regarding the potential return if appellant had invested her prior or existing cash assets or chose to rent out her other vacation homes, we see no reason why specific figures from such actions were necessary to support the trial court's facially obvious conclusion that the full range of assets awarded to appellant, if invested and combined with the cash flow identified for M&M market, were sufficient to meet the marital standard of living of an upper middle-class lifestyle. Indeed, in related contexts, the trial court may fully terminate support if the spouse's separate assets are sufficient to meet their needs, regardless of the current investment strategy. (*In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 931–932 [assets awarded at divorce, which have grown, can be used to demonstrate no further need for spousal support regardless of existing investment strategy].) Here, the trial court

could already reasonably conclude that the known income from one asset satisfied appellant's needs under the marital standard of living. The existence of substantial cash and real estate assets that had not been properly invested worked as an obvious backstop to that conclusion, even without direct evidence on how much income appellant could reasonably expect if such assets were reasonably invested.

In appellant's second argument, she contends the trial court made unsupported assumptions about future income related to M&M market. The court allegedly did so by utilizing inflated estimates of M&M market's cash flow and by presuming that past income would continue at similar levels once the business was transferred to appellant.

On the first of these two points, appellant notes that respondent's expert excluded an allegedly anomalous year's earnings from the calculations related to Brite Electric but claims the expert did not make a similar modification related to an anomalous year's earnings related to M&M market. Upon review, however, this court finds no indication in the record that this argument was raised before the trial court or that respondent's expert was challenged on this basis with respect to the income calculations. While the alleged anomaly with respect to Brite Electric was discussed during the trial, neither party points to any similar discussion regarding M&M market, and this court has identified no such discussion. Rather, it appears both parties accepted this calculation at least in part based on the uncertainty as to which party the property would be awarded to, as reflected in the various expert scenarios presented that sometimes calculated M&M market as being awarded to appellant and sometimes calculated it as awarded to respondent. Moreover, appellant did not raise this claim as an objection to the court's tentative order and does not challenge the underlying admission of the evidence. Instead, appellant appears to claim this admitted evidence should have been ignored by the trial court.

The failure to object to expert evidence waives any challenge on appeal. (*Estate of Odian* (2006) 145 Cal.App.4th 152, 167–168, citing Evid. Code, § 353.) Appellant contends no such waiver exists here based on a series of allegations that respondent's

16.

expert provided a late amended report and thus limited appellant's ability to challenge those changes, which included the finding of an anomalous year in the Brite Electric data. But as appellant notes, this timing issue was raised before the trial court and appellant was granted additional time to prepare. Further, appellant's challenge on appeal is not to admission of the report based on timeliness, but to reliance on the evidence by the trial court.

Moreover, although the amended report changed the cash flow analysis for Brite Electric, the record does not show that any changes were made to the cash flow analysis for M&M market. While appellant contends questioning on the changes to Brite Electric's analysis preserved the issue of how M&M market's analysis was conducted, it is not clear why this is so. If the numbers for M&M market contained an anomalous year, they did so from the first report forward. Changes to the Brite Electric calculation may have highlighted that possible angle to challenge the report's calculations, but they in no way prevented appellant from identifying this issue and timely objecting to it at trial. Further, respondent's expert was initially questioned on January 15, 2021, and two additional days of testimony occurred, with the last day occurring on January 21, 2021. Appellant had ample time to recall respondent's expert and question on these issues if needed. Accordingly, we conclude that any challenge to the calculation of prospective income from M&M market based on an allegedly anomalous year was waived for failure to object.

Appellant claims in her second point that the trial court was required to discount the amount of potential income derived from M&M market because appellant would be incapable of managing the operation in the short term, meaning that the actual income would be lower than expected. Appellant points to evidence suggesting she had a limited role in the business before the separation, only a month to come up to speed before the business was transferred to her, had been excluded from the business by court order during the proceedings, lacked access to important documents, expected a complex

transition, and that the business had previously needed support from Brite Electric to suggest the court abused its discretion by speculating without support that M&M market could transition without a disruption to its cash flow.

In response, respondent argues the evidence was sufficient to support the trial court's reasoning. Respondent points to evidence that appellant had managed and been involved with the daily aspects of M&M market for more than 10 years, had assisted with ensuring the market passed its gas storage tank inspections, handled the bookkeeping and payroll for the market, and requested to be in charge of the market at the point the receiver was appointed. Based on this evidence, respondent contends the trial court could properly conclude appellant was qualified to manage a small business, could readily hire someone if additional support was needed for the market itself, and, ultimately, that appellant was "quite capable of running" M&M market.

In reply, appellant concedes she "does not challenge the trial court's factual findings, only its analysis and conclusions." Appellant then argues several of the court's factual findings don't support its conclusion. For example, appellant contends that although the court found she could run M&M market, it also found she would need to learn how to run the gas station or hire someone with that experience. Appellant also noted that while the court recognized appellant's "concerns regarding the transfer date," it only provided her with one month to take over the business. Appellant argues that these contradictions in factual findings demonstrate an abuse of discretion in the court's conclusion that M&M market would generate the same income as before and that appellant could immediately take over the business.

Appellant's arguments do not demonstrate an abuse of discretion by the trial court. " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that … the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We

18.

must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' " (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)  Even if we assume there to be some conflict between a finding that appellant could run the mini-market aspect of M&M market, but needed time to learn the gas station portion or that the court's decision to grant one month for appellant to come up to speed with the business conflicted with appellant's reasonable belief additional time was needed, these conflicts alone would not demonstrate an abuse of discretion, as the question would remain whether any evidence could support the trial court's conclusion that M&M market could continue to operate at or very near to its current income calculations immediately upon transition.

We conclude there was ample evidence to this point.  As appellant concedes, she was and remained capable of running at least the mini-market portion of M&M market. In addition, according to respondent's testimony, much of the gas station business unrelated to continuing licensing was simply the identification and setting of gas prices. Nothing in the record indicates how sales would decline upon the transition, and it appears obvious that sales of gasoline and mini-market goods would not immediately fluctuate based on the skill of one manager.  The court could accept that transition of ownership was not a substantial reason to necessitate additional support.  More simply and to the point, M&M market had continued to run throughout the parties' dispute, even through a transition to a receiver and despite problems created by appellant's refusal to provide certain information about the business to that receiver.  The court could look at this history and conclude that one month was more than enough time for appellant to determine whether she could learn to operate M&M market on her own or whether hiring a manager for either all or merely the gasoline portion of M&M market would be best. Importantly, and as noted above, appellant ultimately choosing to hire a manager would

not necessitate any specific changes to the court's order as it did not need to meet a specific financial figure to ensure the marital standard of living was met and could look holistically at all of the resources provided, both at dissolution and before, to determine appellant needed no further support.

*Appellant's Just and Equitable Argument*

Appellant contends in her third claim that the court's balancing of the factors outlined in section 4320 constituted an abuse of discretion because the court created a situation where respondent would be able to easily maintain or exceed the marital standard of living based on income from Brite Electric, but appellant would likely "be required to invade her share of the community property to pay her expenses." Relying primarily on analogies to *In re Marriage of Smith* (1978) 79 Cal.App.3d 725 (*Smith*) and *In re Marriage of Beust* (1994) 23 Cal.App.4th 24 (*Beust*), appellant contends the trial court overestimated appellant's ability to generate income from M&M market, ignored that appellant had been excluded from M&M market business during the proceedings, and provided respondent with a much easier path to financial success. We do not agree.

Appellant's reliance on *Smith* and *Beust* do not show an error by the trial court. In *Smith*, the trial court erred because it set an automatic date for termination of spousal support despite a record that did not clearly indicate that the affected spouse would be able to meet their financial needs at that time. (*Smith*, *supra*, 79 Cal.App.3d at p. 737.) In *Smith*, the record only showed a guaranteed income of $90 per month, contrasted with recognized needs of $750 per month. (*Id.* at p. 738.) In contrast, here the trial court had credible evidence that appellant could make between $10,000 and $15,000 per month from only one of the assets awarded, that substantial cash assets were or would have been available for investment if not for appellant's actions, and credible evidence that appellant's needs for maintaining the marital standard of living were already met by the $10,000 to $15,000 figure.

20.

In *Beust*, the parties were nearing the end of their original agreement for spousal support, at which point support would be effectively terminated. When the spouse affected by the pending termination requested an extension, showing she was unable to support herself without the current payments, the trial court refused to extend the support. (*Beust*, *supra*, 23 Cal.App.4th at pp. 26–28.) Based primarily on the language of the parties' agreement and the fact the trial court wrongly concluded the affected spouse had provided no evidence of an ability to become self-supporting, the appellate court reversed the order denying modification and ordered the trial court to set a modified level of support in light of the proven changed circumstances. (*Id.* at pp. 28–31.) In contrast to *Beust*, in this case there is no evidence the trial court wrongly interpreted the record in a manner that failed to recognize appellant's needs. In contrast, this court has concluded the record supports the trial court's finding that not only did appellant receive sufficient income from M&M market to support her marital standard of living, but that the trial court correctly recognized the substantial equalizing payment that was made well before dissolution was a relevant factor in ensuring that appellant could have created even more income had she invested those funds reasonably.

Ultimately, the evidence supports the trial court's conclusion that spousal support is not required in this instance based on the well-known income stream from M&M market and both the substantial early equalization payment and the ability to generate income from the additional forthcoming equalization payment or payments. While appellant was excluded from business matters during the proceedings, the court could recognize her past work in the business would provide her with substantial and meaningful experience. Further, the court certainly knew that appellant's exclusion from the business was in part due to her own actions and did not reflect an inability to run the businesses generally. Accordingly, this court sees no abuse of discretion in the trial court's decision.

### *Attorney Fees Decision*

In an argument related to the spousal support award, appellant argues the trial court abused its discretion by not awarding appellant her full attorney fees. Although the trial court's order ensured that both parties' attorney fees were paid in equal proportion to the point of dissolution, the court ordered both parties to pay their remaining outstanding attorney fees going forward. Appellant argues that the errors allegedly made by the trial court in denying her spousal support infected its award of attorney fees. Appellant contends the trial court failed to appreciate that respondent could afford to pay the fees based on its erroneous determination of respondent's cash flow and that the trial court's order required appellant to put her equalization payments to both her living expenses and her attorney fees.

Under section 2032, the court may award attorney fees and costs where the award is just and reasonable under the relative circumstances of the parties. In making this determination, the court shall take into consideration the circumstances of each party as described in section 4320. (§ 2032, subd. (b).) One parties' ability to pay is not a detriment to granting them attorney fees, but financial resources are only one relevant consideration in the overall equitable determination. (*Ibid*.) The fees can be paid "from any type of property, whether community or separate, principal or income." (§ 2032, subd. (c).) We review such decisions for an abuse of discretion. (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829.)

The court finds no abuse of discretion in the trial court's order requiring the parties to pay their own outstanding attorney fees after dissolution. To the extent appellant contends that errors in the spousal support award infected the trial court's determination, this court has found no error in the trial court's analysis. Further, upon review, it is apparent that appellant has both adequate potential income and adequate resources to ensure she has access to adequate legal representation. The record does not compel a finding that no rational trial judge could determine the parties should each pay for their

own outstanding attorney fees after dissolution, particularly given the fact the community paid equal and substantial portions of each parties' fees prior to dissolution.

### *Valuation Date for Investment Accounts*

Finally, appellant argues the trial court erred when it decided it would value the investment accounts awarded to appellant as of June 20, 2021, rather than as of January 2020, the start of testimony in the trial that lasted at least through January 2021. Appellant contends this choice violated section 2552, which she contends does not permit the valuation of any assets after the opening of the trial.

*Standard of Review and Applicable Law*

Under section 2552, upon dissolution "the court shall value the assets and liabilities as near as practicable to the time of trial" (§ 2552, subd. (a)) with the exception that the court may, for good cause, "value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner" (§ 2552, subd. (b)).  The court reviews valuation determinations for an abuse of discretion.  (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.)  An abuse of discretion may occur if the trial court adopts the wrong legal standard or the determination lacks substantial evidence.  (*Ibid.*)

*The Court Acted Within Its Discretion*

The crux of appellant's argument is that the trial court lacked any authority to determine the value of assets at a point after trial started.  However, this position is contradicted by both the statutory language and the case law.  Under section 2552, the court is not required to set the value at the time trial starts but rather "as near as practicable to the time of trial."  The meaning of the statute has been interpreted not to mean the initial trial in the case but instead "as near as practicable to the court proceeding in which a proper division takes place."  (See *In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 310 [discussing history].)  Indeed, *Oliverez* confirms that the trial

23.

court can, in proper circumstances, value property as far after trial as the date of remand following appeal. (*Ibid.*)

In this case, the trial court was faced with a situation where testimony began in January 2020 and extended at least through January 2021. The value of the investment accounts was likely to change, potentially substantially, during this time. The court thus acted within its discretion in seeking to find a date for valuation as close to trial as practicable. Its decision to set the valuation as close to the point of decision as possible was logical and practical given the court was continuing to resolve disputes regarding the distribution of other property owned by the parties. The valuation of the changing investment accounts would be important to ensuring as equal a distribution of property as possible under the circumstances. This recognition was not invalidated by the court's decision not to reevaluate the value of stipulated properties, as neither party alleged such a reevaluation was required and the trial court had no obligation to upset the parties' settled expectations with respect to those issues. Nor was it undercut by its valuation date for contested business entities, as those values involved expert opinion and complicated calculations that meant the valuation made at the time of trial was likely the most accurate available. In contrast, determining the value of the investment accounts merely required updating their balances as of the relevant dates.[2] Accordingly, we find no abuse of discretion in the trial court's valuation of the investment accounts.

---

[2] In summarizing the facts, appellant makes certain statements suggesting the valuation selected by the court was not supported by competent evidence. However, appellant makes no legal argument on this point and has thus forfeited any such argument. Regardless, the trial court ordered the parties to submit updated figures in a joint filing. The parties' conflicts resulted in both submitting separate briefs. Respondent provided updated figures by declaration in his brief and appellant did not offer competing figures for the relevant dates or object to the figures respondent submitted. Rather, appellant objected only to the relevant date being considered. Accordingly, even if the issue were preserved, we would find no error.

## DISPOSITION

Respondent's motion to dismiss is DENIED. The judgment is affirmed. Costs are awarded to respondent.

HILL, P. J.

WE CONCUR:

PEÑA, J.

SMITH, J.